FILED

APR 0 8 2026

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | I N F O R M A T I O N |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. **1 :26 CR 0 0 1 7 0** |
| | ) | |
| KYLE MARKUS KRUSE, | ) | Title 18, United States Code, |
| | ) | Sections 1349, 1957, and 2 |
| Defendant. | ) | |
| | ) | **JUDGE BARKER** |

GENERAL ALLEGATIONS

At all times relevant to this Information, unless otherwise specified:

Relevant Individuals and Businesses

1.      Defendant KYLE MARKUS KRUSE resided in or around Longwood, Florida.

2.      Person 1 resided in or around Tarzana, California.

3.      Defendant owned and controlled Credit Consultants USA, LLC ("Credit Consultants"), a business registered in the state of Florida on or about December 14, 2019.

4.      Defendant and Person 1 owned and controlled Glo Credit Inc. ("Glo Credit"), a business registered in the state of Colorado on or about January 3, 2017.

5.      Person 1 owned and controlled:

        a.      Business 1, which was registered in the state of Florida on or about September 20, 2019, and

        b.      Business 7, which was registered in the state of Florida on or about September 24, 2021.

6. Jessica Camacho (charged separately) resided in Miramar, Florida. Camacho owned and controlled Battle Beauty LLC ("Battle Beauty"), a business registered in the state of Florida on or about June 23, 2020.

7. Person 2 resided in or around Hollywood, Florida. Person 2 owned and controlled Business 2, which was registered in the state of Florida on or about December 12, 2019.

8. Person 3 resided in or around Hollywood, California. Person 3 owned and controlled Business 3, which was registered in the state of California on or about June 22, 2020.

9. Person 4 resided in or around Pompano Beach, Florida. Person 4 owned and controlled Business 4, which was registered in the state of Florida on or about May 12, 2020.

10. Person 5 resided in or around Jamaica, New York. Person 5 owned and controlled:

a. Business 5, which was registered in the state of Florida on or about January 29, 2016, and

b. Business 9, which was registered in the state of Florida on or about June 23, 2020.

11. Person 6 resided in or around Miami, Florida. Person 6 owned and controlled Business 6, which was registered in the state of Florida on or about June 19, 2020.

12. Person 7 resided in or around Coral Springs, Florida.

13. Person 8 resided in or around Wauchula, Florida and was the father of Person 1. Person 8 owned and controlled Business 8, which was registered in the state of Colorado on or about March 14, 1996.

2

14. Glo Credit, Credit Consultants, Battle Beauty, and Business 1 though 9 conducted minimal business operations.

Relevant Financial Institutions

15. Bank 1 was a federally insured financial institution based in Charlotte, North Carolina. The following individuals controlled accounts at Bank 1:

a. Defendant controlled a business checking account at Bank 1 opened on or about March 2, 2020, in the name of Credit Consultants ending in x5740 ("Credit Consultants Account").

b. Jessica Camacho (charged separately) controlled a business checking account at Bank 1 opened on or about May 18, 2020, in the name of Battle Beauty ending in x3600 ("Battle Beauty Account").

c. Person 5 controlled the following accounts at Bank 1:

i. a business checking account opened on or about December 8, 2018, in the name of Business 5 ending in x1551 ("Business 5 Account").

ii. a business checking account opened on or about July 14, 2020, in the name of Business 9 ending in x3759 ("Business 9 Account").

16. Bank 2 was a federally insured financial institution based in New York, New York and an approved SBA lender of PPP loans. The following individuals controlled accounts at Bank 2:

a. Defendant and Person 1 controlled a business checking account at Bank 2 opened on or about May 8, 2020, in the name of Glo Credit ending in x5879 ("Glo Credit Account").

b. Person 1 controlled a business checking account at Bank 2 opened on or about October 25, 2019, in the name of Business 1 ending in x9982 ("Business 1 Account").

3

  c.  Person 1, Person 4, and Person 7 controlled a business checking account at Bank 2 opened on or about August 3, 2020, in the name of Business 7 ending in x0383 ("Business 7 Account").

  d.  Person 2 controlled a business checking account at Bank 2 opened on or about December 28, 2019, in the name of Business 2 ending in x4843 ("Business 2 Account").

  e.  Person 3 controlled a business checking account at Bank 2 opened on or about July 9, 2020, in the name of Business 3 ending in x1628 ("Business 3 Account").

17. Bank 3 was a federally insured financial institution based in San Franscico, California. Person 6 controlled a business checking account at Bank 3 opened on or about May 19, 2020, in the name of Business 6 ending in x9070 ("Business 6 Account").

18. Bank 4 was a financial institution based in Coral Gables, Florida and an approved SBA lender of PPP loans. Person 4 controlled a business checking account at Bank 4 in the name of Business 4 ending in x3306 ("Business 4 Account").

19. Bank 5 was a federally insured financial institution based in New York, New York. Person 8 controlled a business checking account at Bank 5 opened on or about June 24, 2020, in the name of Business 8 ending in x2571 ("Business 8 Account").

The Economic Injury Disaster Loan Program

20. The United States Small Business Administration ("SBA") was an executive branch agency of the United States government. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and assist in the economic recovery of communities after disasters.

21. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and was designed to provide emergency financial assistance to Americans suffering the economic effects caused by the COVID-19 pandemic. One

4

source of relief under the CARES Act was authorization for the SBA to issue loans to small businesses and non-profit entities experiencing revenue loss due to the pandemic.

22.     One form of such assistance was the Economic Injury Disaster Loan ("EIDL") program, which provided loan assistance for certain businesses negatively affected by the COVID-19 pandemic.  To qualify for an EIDL loan, a business had to, among other requirements, be in operation prior to February 1, 2020.

23.     Applicants for EIDL loans used the SBA online portal to submit their application materials.  The servers that processed the EIDL loan applications were in the states of Iowa, Virginia, or Washington.

24.     Applicants had to certify that the information in the application was true and correct, under the penalty of perjury and applicable criminal statutes.  The application process involved filling out data fields relating to the size and ownership of the affected business entity, and other information about the relevant business for the 12 months prior to COVID-19 impacting the national economy, such as the number of employees in the business, the gross business revenues realized, and the cost of goods sold.  This information, submitted by the applicant, was then used by SBA systems to calculate the amount of money the applicant was eligible to receive.

25.     Pursuant to the provisions governing the EIDL program, loan proceeds could only be used by the affected business receiving EIDL loans for certain permissible expenses.  The loans could be used by the business to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the COVID-19 disaster not occurred.

26.     The CARES Act also authorized the SBA to issue advances or grants of up to $10,000 to small businesses.  The amount of the advance was determined by the number of

5

employees the applicant certified having ($1,000 per employee, up to $10,000).  The advances did not have to be repaid, and documentation of employment was generally not required.

The Paycheck Protection Program

27.  The CARES Act authorized forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"), which was administered by the SBA.

28.  In order to obtain a PPP loan, a qualifying business submitted a PPP loan application, which was signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application (SBA Form 2483), the small business (through its authorized representative) was required to provide, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, businesses applying for a PPP loan were required to provide documentation confirming their payroll expenses.

29.  A PPP loan application was processed by a participating lender.  If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies. While it was the participating lender that issued the PPP loan, the loan was 100% guaranteed by the SBA.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.  The servers that processed the PPP loan applications for the SBA were in the states of Virginia or Oregon.

30.  PPP loan proceeds were required to be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest

6

and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a defined portion of the PPP loan proceeds on payroll expenses.

COUNT 1
(Conspiracy to Commit Wire Fraud and Bank Fraud, 18 U.S.C. § 1349)

The United States Attorney charges:

31.     The allegations contained in paragraphs 1 through 30 of this Information are incorporated by reference as if stated fully herein.

The Conspiracy and Scheme to Defraud

32.     From in or around July 2020, and continuing through in or around December 30, 2021, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant KYLE MARKUS KRUSE, and others known and unknown to the United States Attorney, did knowingly and intentionally combine, conspire, confederate and agree with each other to commit federal fraud offenses, that is:

a.     to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343; and

b.     to participate in a scheme and artifice to defraud a financial institution and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of federally insured financial institutions by means of false and fraudulent

7

pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

The Objects and Purposes of the Conspiracy and Scheme

33. The objects and purposes of the conspiracy and scheme included, but were not limited to, the following: for Defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) obtaining COVID-19 pandemic government stimulus funds, including PPP and EIDL funds and including funds owned and held under the custody and control of federally insured financial institutions, based on false pretenses; (b) diverting fraud proceeds for the Defendant's and co-conspirators' personal use, the use and benefit of others, and to further the conspiracy and scheme; (c) concealing the existence of the conspiracy and scheme.

Manner and Means of the Conspiracy and Scheme

34. The manner and means by which Defendants, and co-conspirators carried out the conspiracy and scheme included, but were not limited to, the following:

a. Defendant, Person 1, and confederates and co-conspirators, including Persons 2 through 8, submitted and caused to be submitted PPP and EIDL loan applications containing false information for entities under their control and the control of confederate borrowers, including Glo Credit, Credit Consultants, Battle Beauty, and Business 1 through 8.

b. Defendant, Person 1, and confederates and co-conspirators, including Persons 2 through 8, created and caused to be created accounts and PPP and EIDL loan applications using online portals at Bank 2, Bank 4, and the SBA.

c. Defendant, Person 1, and confederates and co-conspirators, including Persons 2 through 8, directed confederate borrowers to provide Defendant and Person 1 with all necessary personal identifying information of the confederate borrowers so Defendant could

8

submit the PPP and EIDL loan applications and maintain account access to the accounts throughout the loan process.

d.      Defendant, Person 1, and confederates and co-conspirators, including Persons 2 through 8, and others created and caused to be created PPP and EIDL loan applications that falsified the applicant entities' operations and finances, including the number of employees and the amount of monthly payroll related to PPP loans, and gross revenue and cost of goods sold related to EIDL loans, to qualify for loans and increase the approved amounts.

e.      Defendant, Person 1, and confederates and co-conspirators, including Persons 2 through 8, submitted and caused to be submitted falsified documents to support the falsified figures in applications, including the following tax and wage documents: Internal Revenue Service ("IRS") Forms 940 (Employer's Annual Federal Unemployment Tax Return), IRS Forms 941 (Employer's Quarterly Federal Tax Return), IRS Forms W-2 (Wage and Tax Statement), IRS Forms W4 (Employee's Withholding Certificate), and IRS Forms W3 (Transmittal of Wage and Tax Statements).

f.      Defendant, Person 1, and confederates and co-conspirators, including Persons 2 through 8, caused the fraudulent PPP applications to be submitted, typically through online portals, including at Bank 2 and Bank 4, and coordinated the submission of fraudulent EIDL applications through the SBA's online loan portal.

g.      Defendant, Person 1, and confederates and co-conspirators, including Persons 2 through 8, created and caused to be created payroll accounts with third party payroll companies to distribute fraudulently received PPP loan proceeds to Defendant, co-conspirators, and others, giving the false appearance that the business was using loan proceeds on payroll in

9

order to later qualify for loan forgiveness when, in fact, the business did not have actual employees and the payroll distributions were re-directed back to the members of the conspiracy.

<u>Acts in Furtherance of the Conspiracy and Scheme to Defraud</u>

35.    In furtherance of the conspiracy, and to accomplish its object and purpose, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant and his co-conspirators committed and caused to be committed the following acts, among others:

*EIDL Loan and Advances*

a.    On or about the following dates, Defendant and Person 1 submitted and caused to be submitted to SBA, through its online portal, fraudulent EIDL loan and advance applications in the names of the following applicants and businesses, obtaining at least $944,400, with the following amounts obtained as a result of these fraudulent EIDL applications, with proceeds directed to be deposited in the following accounts:

| Application Date | EIDL Applicant and Business | Loan / Advance Amount | Deposit Account |
|---|---|---|---|
| April 2, 2020 | Defendant, Credit Consultants | $5,000 advance | Credit Consultants Account |
| May 30, 2020 | Person 1, Glo Credit | $149,900 + $10,000 advance | Glo Credit Account |
| June 17, 2020 | Jessica Camacho, Battle Beauty | $149,900 + $10,000 advance | Battle Beauty Account |
| June 17, 2020 | Person 5, Business 5 | $149,900 + $10,000 advance | Business 5 Account |
| July 7, 2020 | Person 3, Business 3 | $149,900 + $10,000 advance | Business 3 Account |
| July 30, 2020 | Person 5, Business 9 | $149,900 | Business 9 Account |
| August 14, 2020 | Person 6, Business 6 | $149,900 | Business 6 Account |

b.      On or about December 16, 2021, Person 1 sent an email from a Glo Credit email account to the SBA requesting Glo Credit be extended a loan increase of $700,000 in addition to the loan Glo Credit had already received as described above.

c.      On or about December 22, 2021, transmitting sounds and signals across state lines, Person 1 spoke by telephone with an individual, located in the Northern District of Ohio, who Person 1 believed to be a representative of the SBA.  Person 1 confirmed Person 1 was seeking an EIDL loan increase on behalf of Glo Credit.

*PPP Loans*

d.      On or about the following dates, Defendant and Person 1 submitted and caused to be submitted to the following lenders, Bank 2 and Bank 4, through their online portals, fraudulent PPP applications in the names of the following applicants and businesses, obtaining at least $4,735,806, with the following amounts obtained as a result of these fraudulent PPP applications, and with funds directed to be deposited in the following accounts:

| Application Date | PPP Applicant and Business | Loan Amount | Lender | Deposit Account |
|---|---|---|---|---|
| May 12, 2020 | Person 4, Business 4 | $174,200 | Bank 4 | Business 4 Account |
| July 28, 2020 | Defendant, Glo Credit | $901,100 | Bank 2 | Glo Credit Account |
| July 30, 2020 | Person 1, Business 1 | $920,402 | Bank 2 | Business 1 Account |
| August 4, 2020 | Person 2, Business 2 | $901,100 | Bank 2 | Business 2 Account |
| August 4, 2020 | Person 7, Business 7 | $920,402 | Bank 2 | Business 7 Account |
| August 4, 2020 | Person 3, Business 3 | $920,402 | Bank 2 | Business 3 Account |

11

e. On or about October 13, 2020, transmitting sounds and signals across state lines, Defendant spoke by telephone with an individual, located in the Northern District of Ohio, who Defendant believed to be a representative of Bank 2 conducting a review of Defendant's PPP application for Glo Credit after Bank 2 had frozen and clawed back the available PPP funds from the deposit account. In the call, Defendant made materially false statements related to the PPP application, including related to the business's payroll figures and number of employees, attempting to again obtain control of PPP loan funds.

f. On or about October 13, 2020, transmitting sounds and signals across state lines, Person 1 spoke by telephone with an individual, located in the Northern District of Ohio, who Person 1 believed to be a representative of Bank 2 conducting a review of Person 1's PPP application for Business 1 after Bank 2 had frozen and clawed back the available PPP funds from the deposit account. In the call, Person 1 falsely denied applying for a PPP loan through Bank 2 despite receiving the PPP funds for Business 1 on July 31, 2020, and conducting several same-day transfers with a portion of the PPP funds totaling $120,000.

g. On or about October 13, 2020, transmitting sounds and signals across state lines, Person 2 spoke by telephone with an individual, located in the Northern District of Ohio, who Person 2 believed to be a representative of Bank 2 conducting a review of Person 2's PPP application for Business 2 after Bank 2 had frozen and clawed back the available PPP funds from the deposit account. In the call, Person 2 made materially false statements related to the PPP application, including related to the business's payroll figures and number of employees, attempting to again obtain control of PPP loan funds.

h. On or about October 13, 2020, transmitting sounds and signals across state lines, Person 3 spoke by telephone with an individual, located in the Northern District of Ohio,

12

who Person 3 believed to be a representative of Bank 2 conducting a review of Person 3's PPP application for Business 3 after Bank 3 had frozen and clawed back the available PPP funds from the deposit account.  In the call, Person 3 made materially false statements related to the PPP application, including related to the business's payroll figures and number of employees, attempting to again obtain control of PPP loan funds.

All in violation of Title 18, United States Code, Section 1349.

COUNT 2
(Engaging in Monetary Transactions in Criminally Derived Property, 18 U.S.C. §§ 1957 and 2)

The United States Attorney further charges:

36.     The factual allegations of Count 1 are realleged and incorporated by reference as if fully set forth herein.

37.     On or about September 29, 2020, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant KYLE MARKUS KRUSE, did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, a $50,000 transfer from the Glo Credit Account to the Business 8 Account, such property having been derived from a specified unlawful activity, that is, Wire Fraud in violation of Title 18, United States Code, Section 1343, and Bank Fraud in violation of Title 18, United States Code, Section 1344.

All in violation of Title 18, United States Code, Sections 1957 and 2.

DAVID M. TOEPFER
United States Attorney

By:  Robert F. Corts
Chief, Criminal Division